Numbers 181369 and 181472, Metzler Asset Management GmbH et al. v. Stuart A. Kingsley et al. Good morning to the panel. Good morning Judge Lynch. I'd like to reserve three minutes for rebuttal if I might. Yes, you may. Thank you very much. May it please the court, Greg Lynch. The central issue on appeal this morning is whether the district court erred in finding that the operative complaint in this matter did not adequately plead Sienta as to three individual defendants and the corporate defendant Biogen. And within that there are two actual sub-issues. One, whether Sienta was adequately pledged as to the individual defendants. We submit it was. We also submit that corporate Sienta was adequately pledged. And it's with corporate Sienta I would like to start this morning. But before I do, I want to take a step back and talk a little bit about the theory here and the pink elephant in the room. The pink elephant in the room is Biogen 1. It's a case that is cited throughout the papers and was part of the papers below. Biogen 1 was a discreet case. It dealt with a very discreet theory. It asked this question. What effect on sales did the announcement of a PML theft have in October 2014? We know Biogen 1. I just wanted you to know that I knew what it was. Biogen 2, the case we're here today, is fundamentally different from that. First... So your theory, you can't switch theories of defense. Maybe you have new evidence that you could add and then switch the theory of defense. But that new evidence has to be adequate. So can you get directly to the Sienta point? Okay, I will. With regard to the issue of safety profile in corporate Sienta, there is an averment regarding two managerial employees of Biogen, Mr. Ferguson and Mr. Hall. They visited with the preeminent physician in this area of medicine, Dr. Thrower, who is the that Tecfidera is not as safe as Biogen is stating publicly. And that happens no later than the beginning of August of 2014. We know that happened because there's confirmatory evidence in the amendment complaint. There is the performance appraisal of CW-12, which Dr. Thrower told Biogen. It talks about how sales of the drug decreased as kind of a domino theory once Dr. Thrower made his findings public. We also know from Dr. Zanville that he had information that not only did the Shepherd Center share its findings, it also shared its files with Biogen in the summer of 2014. What does that tell us? That tells us that managerial employees at Biogen had information that the drug was not as safe as being advertised publicly. That is prime official evidence of corporate Sienta that was not before the court in Biogen 1. So is there a post-Thrower statement that you identify, that you can identify for me, in which despite having been told that it's not as safe as you're saying, they said it is as safe as we have been saying in the past? I don't know if it gets to that level of granularity. There were six statements that the court found that were potentially actionable. Yes, on September 11th, which was the first chronological statement that the lower court held was actionable, they said, Tecfidera continues to provide patients with effective oral treatment for MS that is supported by a growing body of data reinforcing its benefits and favorable safety profile. Now from where I stand, that is a incongruity between information and words. And therefore, what we've been talking about is probative of at least Sienta from a corporate perspective. There's other evidence from a corporate perspective that I want to speak to as well. Are there other, you were asked about post-August statements. Right, that statement was made September 11th of 2014. Okay, and what is the next statement? The statement after September 11th of 2014, there was one made October 22nd of 2014. We believe Tecfidera is on track to become the most prescribed therapy for MS worldwide. Now that's a whopper of a statement when compared to the fact that the most preeminent doctor in the field is telling you that the drug is not as safe as you are publicly representing. Those are the two 2014 statements. Let me talk a little bit about one of the other new CW Are those the only two post-thrower statements? Those are the most immediate post-thrower statements that the district court found actionable, potentially actionable. We found six altogether chronologically. There was one in September, one in October, and then the other four statements were into January 2015. My focus was on what they said in the fall of 2014. CW15 had a very interesting recitation in the operative complaint here, and that is Biogen, three months before the announcement of the PML death, had worked on an announcement. An announcement which basically said a death is a question of when, not if. Five different departments within Biogen worked on that statement, and it was approved by the so-called G8, the senior-most executives. Now the senior-most executives included the three individual defendants, but we'll keep them aside for a moment. There were five other senior executives of Biogen who approved the statement which basically said a death is a matter of when, not if. Another allegation going to Corporate Siena regarding the safety profile of what happened prior to the announcement of the PML death. Now I don't have to sit here and tell you that Corporate Siena, I know you know from the papers, in the security context, is a logical extension of this court's prior decision in Bank of New England. And it isn't my standing here and trying a Buffalo Bills Hail Mary against the Patriots that that theory should be adopted in the security context. Other courts have gone there. In WorldCom, for example, Judge Cote went there in 2004, and there's an unpublished slip opinion in Stone and Webster, which is part of the record, I believe it's at A732-734, where basically the court walks through Bank of New England and says, you know, Bank of New England does have applicability in the securities context, particularly at the pleading stage. And we would urge this panel to follow what those other courts have done and to tell us emphatically that Bank of New England can be applied in a securities context and it can hold that Biogen had Siena adequately pled as to it, separate apart from whether they were pled as to the individual defendants. I see I'm down to 420, and I'd like to turn to the individual defendants if I can. The individual defendants Siena for the beginning of the class period also stems from the when not if memo that we discussed a little earlier. That was approved in July, three months before the announcement of the PMO. That takes us to the start of the class period here as pled, which was in July 2014. But there are also little tidbits that when combined also take this case in a very different direction with regard to the individual defendants as in Biogen 1. For example, there are a myriad of allegations in Biogen 1 that quite frankly were put in the complaint and designed to address issues that not only the lower court but this court had with regard to the level of detail that was provided in Biogen 1. I'll give you examples. I know there was a big discussion the last time regarding numbers. Where are the numbers? How do we know what the gross amount was? Now, there are at least two examples. There's one CW3. He was a salesperson in Florida and Puerto Rico. He heard that before the announcement of the PMO death, he was writing five new prescriptions a week. Afterwards, he was writing none. CW11, he was responsible for areas in Pennsylvania. There are specific documents from documentary sources that show you how his sales quarters were ramped down specifically in the months following the PMO death. Those amendments were in the complaint specifically to address an issue that was at the forefront of Biogen 1. What statement would you say is most in Congress with that knowledge? February 25, 2015. We have not seen any change in the discontinuation rate. There is a natural discontinuation rate for a product like Tecfidera in terms of tolerability and other things. No evidence of that. The discontinuation rate, and again, there are ellipses in here too. The discontinuation rate has been consistent with, I mean, we look at it relative to the growth of the product. There's nothing that's a signal that says it's not consistent with historical averages. So you're arguing that that is intentional or is it willful conduct? Well, it's intentional and or reckless, which is what this court has required. It's either a statement that was known to be false, or one that was made with such risk of misleading the public in light of what was currently known that it carries a substantial risk of misleading the public at large. Could you help me? Is the discontinuation rate necessarily inconsistent with the fact that there has been a fall off in the prescriptions being requested? I'm not sure I understand. I mean, the discontinuation rate is part and parcel of the fact that doctors are deciding not to prescribe the drug. In the complaints view, in our view, the reason that they're not prescribing it anymore is because there are serious problems with the drug. What Biogen is trying to do is say, well, you know, naturally speaking, certain things happen and there's going to be a fall off, but we're not seeing anything out of the ordinary. But when a sales person testifies that they're going from five to none, so 20 a month to none, I think that goes beyond just historical anomalies. Wasn't there at that time also, however, competing drugs which were coming on the market at the same time? And would that have had some effect? Obviously, to the extent that it made it easier for a doctor to take someone off something that's been proven unsafe or shown to be unsafe and move them to something else, yes, that would have relevance there. Well, if one looks at most drug ads these days, everything's unsafe. So your basic argument is this was unsafer than most of the unsafe. It was unsafer than they were representing, than Biogen was representing publicly. That's the dichotomy. I'm back to Judge Barron's question and the fact that the statement referred to historic rates, that we don't see any pattern emerging here that's different from historic rates. I guess I would answer that with CW1. And I see I'm down to 12 seconds, so I'll answer the question and sit down. CW1 testified to an emergency nationwide meeting that she attended in December 14 or January 15, where she sat through a slideshow. And that slideshow presented nationwide numbers showing that Tecfidera numbers were falling off dramatically. Now, she's a human being. We're all human beings. There are certain things we remember. Do we remember everything about every PowerPoint presentation that we have sat through in our lives down to granularity? The answer is no. Common sense just doesn't show you that that's not what human beings can plausibly allege, particularly years later. But the fact that she sat through a nationwide emergency meeting called by Biogen and could recall the substance of a PowerPoint presentation which tracked lower numbers, not only means that, one, they were telling their whole sales force, we've got a problem here, and, two, it shows that the corporation itself was tracking the numbers because if they weren't tracking the numbers, they couldn't put forth a nationwide PowerPoint-type presentation. Okay. You have three minutes. Thank you very much, York. Good morning. May I please the court, James Carroll for Biogen and the individual defendants. Biogen 1 wasn't a pink outfit. It was a final judgment. This court's opinion in Biogen 1 concludes by saying, we wish to discourage the suggestion that there can be a leisurely and repeated bite at the apple. Here's what happened subsequently. Counsel, you can order these arguments any way you want, but I think it would be more helpful to me if you reach the res judicata point second. Very good, Your Honor. Then what I'd like to go to is directly to the point about the discontinuation rates and what is pled with respect to those. What discontinuation rate is is when someone's on the drug and then comes off. And Tecfidera, just to set the stage, is the safest and most effective and most popular oral MS drug in the world. There are no safety concerns. This hasn't been taken off. This is changing the lives of people around the world in huge quantities. It's revolutionary. It's safe, and it has been successful from a business point of view. Here's what the record evidence is with respect to discontinuation and the allegations attributed to Dr. Thrower in the so-called Shepard Center. You heard counsel say in the summer of 2014, whatever research was done there was such that concerns were expressed. He called them managerial employees. These are low-level employees about safety. And then of the 400 patients treated by that one center, 200 of them were taken off the drug. They were discontinued. That's the summer of 2014. Later in 2014, in December of 2014, this is what Biogen discloses about discontinuation rates. The CFO tells investors to be mindful of Tecfidera's discontinuation rates, which were in the teens and higher than the company would have hoped for an oral multiple sclerosis drug. That's significantly after the information communicated to the company with respect to the Shepard Center, and multiple times thereafter throughout the class period, the company repeatedly gives cautionary language about Tecfidera's growth rate. What's the timing of that statement relative to the statement that opposing counsel quoted about discontinuation rates that was made by Biogen? So that was in December of 2014. Subsequently, there are other statements from Biogen talking about we've not seen essentially changes in what we had seen previously in the discontinuation rates. And those statements, of course, are objectively true. You said Biogen made a disclosure about discontinuation rates being in the teens. Yes. Does that come before or after the statement your opposing counsel identified as Biogen having made about discontinuation rates not varying? Not varying. That came before, and then subsequently Biogen says, and we don't see them varying. The evidence that the plaintiffs point to to say, well, what you said about the discontinuation rates must not be true, and indeed must have been, you know, these subsequent statements must have been made with Sienter, came before that. There's nothing in the evidence, nor could there ever be, that would suggest that Biogen's statements about those discontinuation rates are wrong because the information is public in terms of what the sales are for Tecfidera every quarter. Every quarter you see what they are, and what happened with the benefit of hindsight is exactly what Biogen suggested would happen, that Tecfidera, which had been on an enormously sharp growth rate, it was a revolutionary drug, had the growth rate slow for a number of factors. One of the factors was the overhang from the announcement of the PML event in the fall of 2014. It took a while for that to be absorbed into the market, and then we now know what happened afterwards. Well, when you look at the full year 2015 numbers, the whole year turned out to again be a spectacular success. The growth rate, Tecfidera, 2015 over 2014 was 25%. There's nothing inaccurate with respect to the disclosures of discontinuation rates, and indeed the cautious language that is throughout the class period is entirely consistent, not inconsistent, with the very things stated by the so-called confidential witnesses. Some sales rep in some region saying my sales screeched to a halt, or dropped dramatically, or I lost 20%. Well, that's all well and good. That's one particular region, one particular sales rep. The actual sales are reported quarterly and are not challenged in this case as anything but 100% accurate and could not be. Could you tell me the relationship between the discontinuation rate and the growth rate? Sure. The discontinuation rate is the rate in which patients who are on the drug for whatever reason come off it. They can't tolerate it for some reason. That's one of the factors that goes into the growth rate. Other factors will be the number of new patients and the expansion of the market overall switches from other drugs. And Biogen did have announced another drug during this period of time. In this period of time, what was the relationship, the percentage relationship, if you know, between the growth rate and the discontinuation rate? So I couldn't give you the precise answer, Judge Stahl. But what happened is the growth rate started very sharply, moderated, and then continued up. The discontinuation rate, as best as I know, was in the mid-teens as publicly disclosed by the company and stayed the same. There's no allegation anywhere that it was otherwise. I would, if I might, absent questions about that. Just one last question. Please. You may characterize it in a different way than they would characterize it. But from your perspective, is there anything in the record from any of the confidential witnesses or plaintiffs' side that spoke directly to discontinuation as opposed to drop-off in sales? I think the best thing is indeed what plaintiffs pointed to, which is the allegations about the doctors in the Shepherd Center. Because what they said, again, before Biogen's December statement, they said, we discontinued 200 of our 400 patients. That's discontinuation. And it's entirely consistent with the company's public disclosures. If you would indulge it, I would like to address the race to cut argument, albeit briefly. And I want to address it not because it will result in any real efficiency in this case. Of course not. The district court already did the work twice. And this court is now doing the same work twice. But that shouldn't be. A final judgment should happen one time. And what happened here is an end run around the PSLRA. And I respectfully submit using claim preclusion in this case to stop this from happening is entirely consistent with the Supreme Court's recent China Agritech case. Here's why. And I want to go back to what really happened here. So what happened here is the case was filed, this is August of 2015, pursuant to the very unique protections of the PSLRA. Public notice goes out. Anyone who's interested, anyone who's interested in taking control of that case, any shareholder can step forward and bring a case. And indeed, in the 90 days between the complaint being filed and Judge Saylor appointing a lead plaintiff, five different purported class reps stepped forward to be lead plaintiff in the case. Ultimately, Judge Saylor picked the GBR group. They wanted to represent the class. They needed a representation that they would. There was public notice and effectively a competitive process for the very lucrative position of being lead plaintiff and more so lead counsel. The court in doing that under the unique provisions of the PSLRA, it's not strictly doing it under Rule 23, but the PSLRA itself refers to and incorporates Rule 23. The court had defined for the lead plaintiff selection that this lead plaintiff could adequately and typically represent the class. The PSLRA expressly incorporates that part of Rule 23, albeit on a preliminary basis, but that's what happened. The plaintiff in this case appointed in case one, the GBR group, got to be the lead plaintiff. Case didn't go well for them at the district court. They appealed. While that appeal was pending, the same lawyers approved by the court in case number one filed another case in the district court while the appeal was still pending. And what did they do with it? They copied in all the allegations that were in case number one already rejected by the district court and then subsequently added a few more. So I guess just to cut to the chase legally for me, if it's not a certified class, for Rule 23 purposes it can't bind. Obviously here, because of the different requirements of the statute that we're dealing with compared to Rule 23, you don't have to meet all the requirements for certification of a Rule 23 class, right? So I respectfully take issue with your first premise. It's not obvious that because there was no Rule 23 certification it can't bind. Here's why. The Supreme Court's Taylor case cites a Rule 23 class as inclusive of the kind of thing that can give adequate representation. The issue here is will the people who aren't the lead plaintiff in the first class have due process? Is it going to be good enough? And you combine the opportunity that there could be something other than a fully certified Rule 23 class with the protections of the PSLRA that are unique. There's no other part of class action that does that. In your view, then, what is the best case in a sort of analogous circumstance where somebody could represent other parties that has not been certified as a representative under Rule 23? I think the best case is the Supreme Court's China Agritech ruling of earlier this year, and here's why. It's a PSLRA case, so it's a securities case, unlike Taylor and unlike Smith by Bear. It's a securities case. And what the Supreme Court did there, for the same reasons I'm urging here, reasons of efficiency and finality, the Supreme Court said enough with this serial American pipe tolling for successive class actions. And in that securities case there were three rounds of cases. Here we only have two. And the Supreme Court said, looking at the protections of the PSLRA, public notice, you can come in and you have a chance to take care of this, be in charge of this case if you want. Judicial approval, selection of the lead plaintiff with Rule 23 in mind, that's good enough. Concerns of judicial efficiency and finality matter. Were they dealing with a representative in this issue? Well, they weren't dealing, it wasn't the... So go back, what is the best case, put aside China Agritech, of a case in which the court was focused on representativeness and concluded that somebody could represent and bind others, even when there had been no certified class? There is no case to be very, there is no case that has done what I'm suggesting is appropriate to do here. My argument is not based in pointing at another case that's done it. I'm pointing at the rationales that are in China Agritech and Justice Sotomayor's opinion in particular goes to it in great detail. And I'm pointing at the special protections of Rule 23 and principles of efficiency and finality, I think added together, make this a ripe situation for claim preclusion.  The argument is, well, there's not adequate representation, that's the argument. No, one of his arguments is that it's not final. And you haven't talked about that at all. I'm sorry, Judge. The PSLRA certification is not final. That's right. The case law suggests that it's preliminary. I thought you conceded that at the outset. So why are the interests of finality served by giving preclusive effect to a non-final determination? That has also not been tested on appeal. The interest would be satisfied because there's adequate due process associated by what the PSLRA does present. And in a securities context, what happens at Rule 23 that's really different from what happens at the PSLRA? It would be our judgment independently of what Congress were to say. If Congress were to add to the PSLRA and any certification will have the effect of binding members once lead class counsel is chosen, whether or not the class is certified. Congress certainly didn't do that. So apart from the constitutional question, I think we have an intent question. I just don't see anything in the PSLRA that supports your argument. May I just answer that one? It's a good argument. So here's the answer to the question you posed, if I may. Yeah. The whole point of the PSLRA was to avoid this multiplicity of securities cases prior to the PSLRA. You just sat through an oral argument, I believe, as to a main statute where we were questioning whether courts have the power to imply new terms that the legislative body has itself declined to put in. Thank you, Don. Thank you. Good morning again. One of the reasons I reserved three minutes was because of the presence of the cross-appeal, and I didn't want anybody to think I was avoiding it. In light of the colloquy that just went on, I think I will rest on my papers with regard to what's in the cross-appeal, unless UR has any questions for me. Just one point that the last colloquy just raised for me. What are we interpreting? Are we interpreting issue preclusion law, which is a kind of common law doctrine, or are we construing the PSLRA as if the claim is that the statute requires the preclusion? In the way I view it, it's a common law question. It's a question of this court has set forth a three-prong test for ratio to conduct a federal judgment. So federal common law determines the preclusive effect of a final federal judgment. I don't think the PSLRA has anything to do with it for reasons that were already discussed. It's a preliminary finding. You're only looking at two prongs of four prongs of 23A. There's no 23B analysis. So I don't think the PSLRA has anything to do with it. That's sort of just what I'm a little bit stuck on. If you start thinking of it as a common law doctrine, why are the last two prongs of 23 relevant to the question that the common law would ask, which is whether you're representative? I guess I'm not following the question. The last two prongs of 23, predominance, superiority, even commonality, but superiority and predominance seem relevant to the concerns that underlie rule 23, which is should we allow there to be a class instead of individualized actions. But in terms of representativeness, you might think typicality, commonality, et cetera, would be more relevant concerns, and the PLSRA incorporates those. So for common law purposes, I guess there's a finality issue I get. But I guess I'm just wondering, how do we think about the common law when we've got some indication through the statute that there is a degree of representativeness? The Supreme Court, in the three cases that began with Taylor, that went to Smith, that went to Knowles, talked in terms of a proposed class action is not enough to bind people. And in Taylor, there was the point made that it's the procedural safeguards in rule 23 that trigger preclusive effect. I would argue that the procedural safeguards in rule 23 encompass all the requirements. There's a reason all the requirements were there. If the law doesn't do anything, well, we'd like to think the law doesn't do anything that's superfluous. There are four prongs for 23A and a separate 23B prong. All of those prongs have to be met in order for the procedural safeguards of rule 23 to be met and for there to be preclusive effect. And in those cases, if none are met, then you don't have any claim for representativeness. And here we've just got the odd circumstance. Some of them are arguably met. The ones that are met might be the ones that are relevant to representative cases. I'll leave you with one point. In researching for this argument, I came across the lead plaintiff order in the BP case, the Gulf spill. And what the BP court said, and this is at 758 F sub 2nd at 435, to make a preliminary showing of typicality and adequacy, quote, potential lead plaintiffs need not submit evidentiary proof of typicality or adequacy. The district courts are the ones who are on the line here making these decisions every day. And if they're not acquiring evidentiary proof, I fail to see how the tailored test of procedural safeguards is met. And I thank you for your time this morning, Your Honor. Thank you both. A very interesting case. Thank you.